Ellis A. Gimbel v. Commissioner.
Gimbel v. Commissioner
Docket No. 9640.
United States Tax Court
1947 Tax Ct. Memo LEXIS 123; 6 T.C.M. (CCH) 917; T.C.M. (RIA) 47227; July 31, 1947
Samuel H. Levy, Esq., 1204 Packard Bldg., Philadelphia 2, Pa., for the petitioner. Karl W. Windhorst, Esq., for the respondent. HARLAN Memorandum Opinion HARLAN, Judge: Respondent determined a deficiency in the income tax of petitioner in the amount of $1,191.27 for the calendar year 1941. The sole question is - what is the basis for gain or loss of 4,000 shares of the common stock of Gimbel Brothers, Inc., sold by petitioner in 1941? [The Facts] The facts are stipulated and we adopt the stipulation as our findings. For the purposes of this opinion the following statement will suffice: Petitioner, a resident of Philadelphia, Pennsylvania, filed his individual income tax return for the calendar year 1941 with the collector *124 of internal revenue for the first district of Pennsylvania, at Philadelphia. On October 2, 1929, and at all times hereinafter mentioned, petitioner was a vicepresident of Gimbel Brothers, Inc., a New York corporation, and a member of its board of directors. On that date petitioner was also the owner of 24,281 shares of the corporation's common stock. He had acquired this stock in 1922 at a cost of $31 per share. On October 2, 1929, the petitioner, together with other stockholders, some of whom were officers and directors of Gimbel Brothers, Inc., entered into subscription agreements whereby they undertook to subscribe for and to purchase additional shares of common stock at $25 a share on certain terms and conditions. Under the terms of the subscription agreement which he executed the petitioner irrevocably undertook to subscribe for and to purchase 14,568 of the additional shares. On October 2, 1929, Gimbel Brothers, Inc., had outstanding 622,500 shares of common stock. The subscription agreement stated that it was contemplated that the corporation by due action of its board of directors and stockholders would increase its authorized common stock to 2,000,000 shares, and that *125 out of such additional shares the corporation would offer 373,500 shares for subscription by its holders of common stock at $25 per share on the basis of three new shares for each five shares held of record on a date to be determined. The subscription agreement would terminate if this had not been done by December 31, 1929 The subscription agreement also stated that it was a condition of the subscription that subscriptions made by the petitioner and other individuals named in the subscription agreement would aggregate not less than $175,000 of the shares of common stock to be offered, and that the balance would be underwritten by bankers, including Goldman, Sachs & Company and Lehman Brothers, on customary terms at a commission of $1.25 for each of the shares underwritten, the total not to exceed 198,500 shares. The subscription agreement further stated as follows: "* * * It is contemplated that this subscription agreement and like subscription agreements shall be disclosed to the bankers as an inducement to their entering into the proposed undewriting. If the undersigned or any other of the abovementioned individuals so subscribing shall default in his or her subscription agreement, *126 the Corporation and the several individuals who shall have subscribed and shall not so default shall each have a right of action against the defaulting subscriber under his subscription agreement, and each subscriber recognizes that the bankers may rely upon such subscription agreements and may be entitled to recover damages from any defaulting subscriber." The petitioner was obligated under the subscription agreement to deposit the warrants evidencing the rights to subscribe for additional shares with a Deposit Committee within forty-eight hours after these rights were issued in accordance with the proposed offering. The petitioner also agreed to pay to the Committee not later than forty-eight hours before the expiration date of the offering the sum of $364,200 which the Committee would forthwith cause to be applied to the purchase of the shares of stock subscribed for by the petitioner. The subscription agreement was accompanied by a Deposit Agreement also dated October 2, 1929, between the petitioner, Bernard F. Gimbel and Richard Gimbel, as Committee for Subscribers to Common Stock of Gimbel Brothers, Inc., under which the Committee the rights to subscribe for the 14,568 additional *127 shares which the petitioner had agreed to purchase. The subscription agreements and deposit agreements of October 2, 1929, were entered into in anticipation of the proposed offering of 373,500 shares of additional stock to the stockholders of the Company on the basis set forth. The number of shares of stock subscribed for under the subscription agreements was 205,500. The underwriting agreement, dated October 3, 1929, between Gimbel Brothers, Inc., and Goldman, Sachs & Company and Lehman Brothers, covered the 168,000 shares of the proposed offering which had not been suscribed for under the subscription agreements dated October 2, 1929, and the underwriters agreed to purchase such portion of these 168,000 shares as were not purchased by the other stockholders. On October 3, 1929, Bernard F. Gimbel, President of Gimbel Brothers, Inc., and a member of the Deposit Committee, wrote a letter to Goldman, Sachs & Company, Syndicate Agents, 30 Pine Street, New York, New York, wherein it was stated: "Dear Sirs: "On behalf of the committee mentioned in a number of subscription agreements in the form annexed, evidencing the undertaking of the individuals therein mentioned, to purchase *128 in the aggregate 205,500 shares of common stock in Gimbel Brothers, Inc. pursuant to the pending offer to stockholders: "Immediately after the expiration of forty-eight hours from the date of mailing to stockholders of warrants evidencing rights to subscribe the committee will report to you the amount of warrants received from such subscribers, together with the serial numbers of such warrants, and will not dispose of such warrants or use them for any purpose except to complete the purchase of the 205,500 shares of common stock pursuant to the offering and the subscription agreements. Very truly yours, (signed) Bernard F. Gimbel" On October 4, 1929, Bernard F. Gimbel, president of Gimbel Brothers, Inc., wrote a letter to the holders of the common stock of Gimbel Brothers, Inc., with respect to the proposed offering of additional shares of common stock, and enclosing therein a notice of a special meeting of the holders of the common stock to be held on October 25, 1929, to act upon the offering. In the letter to the stockholders, the president of the corporation said: "Your Board of Directors at a meeting held today determined, subject to your approval, to offer to holders *129 of Common Stock of the Corporation the opportunity to subscribe for 373,500 additional shares of Common Stock at $25 a share on the basis of three additional shares for each five shares held of record. * * *
"Executives of your Corporation and certain other holders of large amounts of its Common Stock have already agreed to exercise their rights to purchase in the aggregate 205,500 shares of the 373,500 additional shares of Common Stock constituting this offering. The sale of the remainder of the shares to be offered is to be underwritten for an agreed compensation by a syndicate headed by Goldman, Sachs & Co. and Lehman Brothers. * * *" On October 7, 1929, Ashbel Green, Secretary of the New York Stock Exchange, wrote a letter to Bernard F. Gimbel, President of Gimbel Brothers, Inc., with respect to the treatment to be accorded the rights to subscribe to the additional stock proposed to be offered by Gimbel Brothers, Inc. The letter stated: "In the case of the offering by a company of Rights to subscribe to its stockholders, subject to approval, it is the custom of the Stock Exchange not to make the stock ex rights on the record date but to make it ex rights after the approval *130 has been received. The purpose of this custom is to maintain the full value of the stock of the company until the approval has been received. This result is achieved by requiring that all deliveries of old certificates after the record date of the rights must be accompanied by an assignment of the rights to subscribe or "due-bill", as it is generally known…." * * *
On October 11, 1929, Bernard F. Gimbel, President of Gimbel Brothers, Inc., wrote a further letter to Ashbel Green, Secretary of the New York Stock Exchange, wherein it was stated: "Referring to your letter of October 7, 1929, this will advise you that Gimbel Brothers, Inc. will recognize the due bills referred to in your letter on the conditions set forth therein, and will so instruct Guaranty Trust Company of New York as agent of the company for the issuance of warrants." On October 22, 1929, the Deposit Committee wrote a letter to the petitioner notifying him that under the terms of his subscription agreement he should send the warrants evidencing the subscription rights when received immediately to the Committee and notifying him further that he must pay for the shares on or before November 4, 1929. The *131 letter concluded: * * *
"Summed up, the above simply means that you have agreed to deliver to me on account of the Committee, rights for 14,568 shares of Gimbel Brothers, Inc., Common Stock, together with a check in NEW YORK FUNDS for $364,200, on or before November 4, 1929. The check should be made payable to the Guaranty Trust Company of New York, Agent, and if sent after October 25, 1929, should be certified." On October 25, 1929, the Committee on Securities of the New York Stock Exchange issued a further ruling with respect to transactions in the common stock of Gimbel Brothers, Inc. on October 28, 1929, and with respect to the redemption of the Due Bills. The ruling stated: "Referring to the ruling of the Committee on Securities dated October 15, 1929, (C-3800) regarding notice having been received from GIMBEL BROTHERS, INC.
"that holders of Common Stock of record at the close of business on October 18, 1929, would be offered, subject to approval of stockholders, the Rights to Subscribe at $25 per share for Common Stock, of no par value, to the extent of 3 shares for each 5 shares held, that said Rights may be dealt in on a "When Issued" basis on and after October 18, 1929, and *132 that said Common Stock be not quoted ex said Rights until further notice; that all certificates delivered after October 18, 1929, must be accompanied by Due-Bills: "Notice having been received of said approval, the Committee on Securities further rules that transactions in said Common Stock on Monday, October 28, 1929, shall be ex said Rights; "That all Due-Bills must be redeemed on Monday, October 28, 1929; and "That transactions in Rights must be settled on Monday, October 28, 1929, after which date dealings in Rights shall be as in stock. "RIGHTS TO SUBSCRIBE EXPIRE WEDNESDAY, NOVEMBER 6, 1929, AND TRADING THEREIN WILL CEASE AT THE CLOSE OF BUSINESS ON MONDAY, NOVEMBER 4, 1929." Warrants dated October 25, 1929, were issued to each stockholder of record on October 18, 1929, entitling each to purchase three additional shares for each five shares held of record at $25 per share, the right expiring November 6, 1929. The fair market value of the common stock of Gimbel Brothers, Inc., on October 18, 1929, was $30.375 per share. The fair market value of the stock subscription rights issued by Gimbel Brothers, Inc., entitling its stockholders as of October 18, 1929 to purchase *133 additional stock, was $2 per right on that date. The petitioner deposited with the Deposit Committee the sum of $364,200, being $25 for each share included in his subscription agreement. The Committee issued to the petitioner a certificate of deposit acknowledging receipt of the payment and setting forth the Committee's agreement to apply the funds to the purchase of the stock subscribed for in accordance with their agreement. The petitioner deposited with the Deposit Committee the rights issued by the Company for the purchase of the additional stock subscribed for by him. The Committee issued to the petitioner a certificate acknowledging receipt of the warrants to be exercised in behalf of the petitioner in accordance with his agreement. On November 4, 1929, the Deposit Committee subscribed for 205,500 shares of the common stock of Gimbel Brothers, Inc. and directed that the certificates for the new shares be issued in the names appearing on the deposited warrants. Certificates for 14,568 shares were issued in the name of petitioner or his nominee. On November 6, 1929, the Guaranty Trust Company of New York notified Goldman, Sachs & Co., agents for Syndicate Managers, that *134 it had received $5,137,500 in payment of the subscriptions for the 205,500 additional shares of common stock of Gimbel Brothers, Inc.
On November 8, 1929, Gimbel Brothers, Inc., wrote Goldman, Sachs & Co., Agents for the Syndicate Managers, as follows: "Referring to our Agreement dated October 3, 1929, with you and Messrs. Lehman Brothers, as Syndicate Managers, for the underwriting by a Syndicate formed by you of a total of 168,000 out of an offering of 373,500 additional shares of Common Stock made by this Company to its Common Stockholders, we advise you that 518 shares of such 168,000 shares have been subscribed for by the holders of Subscription Warrants exclusive of the 205,500 shares of Common Stock subscribed and paid for by various stockholders and individuals referred to in Paragraph THIRD of said Agreement and that the exact number of shares constituting the unsold balance of said 168,000 shares is 167,482 shares." On November 11, 1929, Gimbel Brothers, Inc. delivered to Goldman, Sachs & Co. and Lehman Brothers, pursuant to the October 3, 1929, Underwriting Agreement, certificates for 167,482 shares of its common stock and a certified check of $210,000, representing *135 (1) $42,000 as compensation for the Syndicate Managers at the rate of 25" per share on 168,000 shares, and (2) $168,000 as compensation of the syndicate at the rate of $1.00 per share on 168,000 shares. On the same date, Goldman, Sachs & Co., as agents for the Syndicate Managers, delivered to Gimbel Brothers, Inc., pursuant to the October 3, 1939 Underwriting Agreement referred to in paragraph 13 hereof, a check for $4,187,050 in payment of the 167,482 shares to be taken up and paid for by the Syndicate. From time to time the petitioner sold or otherwise disposed of the 14,568 shares of stock which were issued to him. The sales of said shares of stock were reported on his 1931 and 1933 Federal income tax returns. Petitioner's 1931 return reported a loss of $17,365 with respect to 1,000 shares of said stock, which sum was computed by using a cost basis of $25 per share and a sales price of $7.75 per share. On his 1933 return, using a cost basis of $25 per share, a loss was reported with respect to a sale of 2,000 shares of said stock. The said returns for the years 1931 and 1933 reported, in lieu of any net income, losses of $205,121.61 and $203,312.31, respectively. During the *136 taxable year 1941, the petitioner sold 4,000 shares of 24,281 shares of stock of Gimbel Brothers, Inc., which he had originally owned prior to October 19, 1929. He received from the sale the total sum of $27,019.56, or $6.754 per share. In his individual income tax return for the calendar year 1941, petitioner reported with respect to the sale of the 4,000 shares a loss of $48,490.22, which represented 50 per cent of the difference between the cost of said shares of $124,000 and the sale price of $27,019.56. The respondent in the deficiency notice dated August 25, 1945, disallowed $4,082.33 of the amount of the loss claimed by the petitioner in his return, and based such disallowance on the following recomputation: Recomputation of Loss on Sale of Stock
Basis as adjusted above
$115,835.34
Sales price
27,019.56
Loss
$ 88,815.78
Loss claimed on peti-
tioner's tax return $96,980.44
Reduction in loss
$ 8,164.66
Recognized reduction in loss 50%
$ 4,082.33
The respondent contends that the petitioner's original cost basis of the 4,000 shares of Gimbel Brothers, Inc., stock must be adjusted in accordance with sections 19.113 (a) (19)-1(b) and 19.22 (a)-8 *137 of Regulations 103, as follows: Date of acquisition: 1922 Cost of shares: ($4,000 X $31.00) = $124,000.00 4,000 (shares) X $28.375 = $113,500.00 (fair market value of old stock ex-rights) 4,000 (rights) X $ 2.00 = 8,000.00 (fair market value of rights) Total $121,500.00 113,500/121,500 X $124,000.00 = $115,835.34 (cost of old stock apportioned to such stock) 8,000/121,500 X $124,000.00 = $ 8,164.66 (cost of old stock apportioned to rights) The petitioner contends (1) that since he was pre-committed to the purchase of 14,568 additional shares of Gimbel Brothers stock, the so-called "rights" which he had received were simply the mechanical means by which his subscription agreement was effected; that under these circumstances, he did not receive a "distribution" of "rights" within the meaning of Section 112(a) (19), I.R.C.; and that consequently, this section of the Code, providing for the reallocation of basis where "rights"are "distributed" by a corporation, is not applicable. He also contends (2) that even if he can be said to have received a "distribution" of "rights" within the technical meaning of Section 113 (a) (19), such "rights" had no market *138 value in his hands because of his prior commitment to purchase the stock, and, therefore, there is no basis for the allocation under the relevant provisions of the Regulations. [Opinion] The applicable provision of the Internal Revenue Code is Section 113 (a) (19) (A), which, in so far as here applicable, provides as follows: "If the property was acquired by a shareholder in a corporation and consists of stock in such corporation, or rights to acquire such stock, acquired by him after February 28, 1913, in a distribution by such corporation (hereinafter in this paragraph called "new stock"), or consists of stock in respect of which such distribution was made (hereinafter in this paragraph called "old stock") and "(i) the new stock was acquired in a taxable year beginning before January 1, 1936; or * * *
"then the basis of the new stock and of the old stock, respectively, shall, in the shareholder's hands, be determined by allocating between the old stock and the new stock the adjusted basis of the old stock; such allocation to be made under regulations which shall be prescribed by the Commissioner with the approval of the Secretary." The section of the Regulations *139 pertinent to the Code as it affects the instant problem is Section 19.113 (a) (19)-1 (b) which provides: "(b) Stock rights acquired after December 31, 1924. - In the case of stock in respect of which were acquired after December 31, 1924, and before the first day of the first taxable year beginning after December 31, 1935, stock subscription rights (whether or not constituting income to the shareholder within the meaning of the sixteenth amendment to the Constitution) or in respect of which were acquired in a taxable year beginning after December 31, 1935, stock subscription rights which did not constitute income to the shareholder within the meaning of the sixteenth amendment of the Constitution, and in the case of such rights, the basis for determining gain or loss from a sale or other disposition of either the stock in respect of which the distribution was made, or the subscription rights distributed, or the stock acquired in the exercise of such rights shall (except as otherwise prescribed in section 19.113 (a) (19)-2) be ascertained in accordance with the principles set forth in section 19.22 (a)-8." The exceptions prescribed in section 19.113 (a) (19)-2 of Regulations 103 *140 do not apply in this proceeding. The pertinent provisions of section 19.22(a)-8 of Regulations 103 are the following: "* * * In the case of stock in respect of which were acquired stock subscription rights which did not constitute income to the shareholders within the meaning of the Sixteenth Amendment to the Constitution, and in the case of such rights, the following rules are to be applied: "(1) If the shareholder does not exercise, but sells, his rights to subscribe, the cost or other basis, properly adjusted, of the stock in respect of which the rights are acquired shall be apportioned between the rights and the stock in proportion to the respective values thereof at the time the rights are issued, and the basis for determining gain or loss from the sale of a right on one hand or a share of stock on the other will be the quotient of the cost or other basis, properly adjusted, assigned to the rights or the stock, divided, as the case may be, by the number of rights acquired or by the number of shares held. * * *
"(2) If the shareholder exercises his rights to subscribe, the basis for determining gain or loss from a subsequent sale of a share of the stock in respect of *141 which the rights were acquired shall be determined as in paragraph (1). * * *." The method of allocation prescribed by the above-quoted sections of the Regulations was approved in the case of Todd v. Commissioner, 72 Fed. (2d) 998, and Perkins v. United States, 12 Fed. Supp. 481, cert. denied 297 U.S. 710. In the Todd case the Circuit Court of Appeals for the Third Circuit, among other things, said: "It must be apparent that, since stock rights are obtained with part of the original capital investment, that fact must be taken in consideration in computing the gain on a sale of the stock from which the rights were obtained as well as when the rights themselves are sold. Otherwise the real cost of the stock and the rights and gain derived from the sale of either could not be computed." We are not impressed with the petitioner's contention that he did not receive a distribution of "rights" within the meaning of Section 112 (a) (19) of the Internal Revenue Code. On brief he argues that the so-called "rights" received were issued pursuant to his commitment to deposit them for exercise; that unlike the other stockholders *142 he had no option of holding the rights until the expiration date to determine whether it would be advisable to exercise them or to sell them; and that in his hands the rights were simply the mechanical means through which he performed his obligation to purchase the additional shares of stock. He urges that the receipt of rights should be disregarded as being without substance. Disregard of form is justified only where it appears that steps taken or acts done were never intended to be of substantive effect. Ralph J. Chandler Shipbuilding Company, 22 B.T.A. 5. All of the stockholders of the corporation, including petitioner, were given the opportunity to subscribe to 373,500 of the additional shares of its common stock. They were all issued stock subscription rights and it was only through the exercise of these rights that they could acquire new stock at $25 per share, and this was true regardless of whether or not the individual stockholder was a party to the subscription agreement. The only distinction between petitioner and the other stockholders who were parties to the subscription agreement, and those stockholders who were not parties, is that the former obligated *143 themselves in advance to personally exercise their rights to subscribe to shares of new stock, whereas the latter refrained from making any commitment and could either exercise the rights when received or sell them. However, the voluntary agreement of petitioner to subscribe to 14,568 shares of new stock does not detract from the fact that he actually acquired these shares through the exercise of the rights to subscribe to alditional stock which he was entitled to receive and did receive because of his ownership of 24,281 shares of old common stock. Under such circumstances, the contention of petitioner, that he received the "rights" only as a matter of form, is not justified. They were matters of substance for without them he would not have been able to purchase 14,568 additional shares at $25 per share. Our conclusion is that petitioner received a "distribution" of "rights" within the meaning of section 113 (a) (19), I.R.C.
Petitioner's remaining contention, in the alternative, is that the rights received had no market value in his hands because of his prior commitment to purchase the stock and, therefore, there is no basis for allocation. On brief he says *144 he has no quarrel with the assignment of a value of $2 each, the market price at which the rights were quoted on October 18, 1929, to the rights distributed to stockholders other than those who had entered into the subscription agreements as those were the rights which were being traded and on which the quotations must have been based. No objects, however, to assigning this value to his rights on the ground that he had no option either to buy or not buy the 14,568 additional shares and could not sell the rights, because of his prior commitment to purchase them. We are unable to see any basis for distinction with respect to the value of the subscription rights issued to stockholders who entered into the subscription agreement and those issued to stockholders who did not enter into the agreement. A commitment to exercise the stock rights when issued did not lessen their value or prevent its realization by the petitioner. This value could be realized either by selling the rights or exercising them. The rights were negotiable and were dealt in on the security exchanges. The value of the rights depended "upon the relative intensity of the social desire" for them, expressed in the money *145 they would bring on the market. Ithaca Trust Co. v. United States, 279 U.S. 151. Based on the prices at which they were bought and sold on these exchanges, we have found as a fact that the rights had a fair market value of $2 per right as of October 18, 1929. This price reflects what willing buyers and willing sellers thought rights to subscribe to the new stock $25at per share were worth on the date that 14,568 of these rights were issued to petitioner. Petitioner received these rights because of his ownership of 24,281 shares of the corporation's old common stock. In Edward Stephen Harkness, 21 B.T.A. 1068, this tribunal made the following pertinent statement: "By the issuance of the stock rights the corporation carved something out of the interest which theretofore was represented by each share of stock. The thing carved out was called a right, and the question is, what portion of the old share was carved out in the right. If this be known, then the cost or basis applicable to the old share can be divided accordingly between a share after the rights have been separated and the right. When either is sold, the amount of gain can be separately computed. *146 However, it is difficult to determine exactly the proportion of the basis for gain or loss of the old share which should be assigned to the right and that which should be assigned to a share after the rights have been separated. The Commissioner later provided by regulations * * * that this allocation should be made in proportion to the respective values of the rights and the shares exclusive of the rights at the time the rights were issued, * * *." Our best judgment is that the respondent correctly determined, in accordance with the provisions of section 19.113 (a) (19)-1 (b) and 19.22 (a)-8 of Regulations 103, that the cost basis of 4,000 shares of old stock of Gimbel Brothers, Inc., sold during 1941, should be reduced by the portion of the cost of the old stock allocable to stock rights, in arriving at the amount of the recognizable loss sustained on the sale. Decision will be entered for the respondent.